# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| H. THOMAS MORAN, II, Receiver of the Assets of LifeTime Capital, Inc. and Certain Affiliated Persons and Entities, | : : | |
| Plaintiff, | : | Case No. 3:06CV050 |
| vs. | : | District Judge Walter Herbert Rice Magistrate Judge Sharon L. Ovington |
| U.S. BANK, N.A., | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

### I.  INTRODUCTION

This is one of several cases pending in this Court concerning the activities of LifeTime Capital, Inc., a corporation involved in the viatical or life settlement industry.  Details about the viatical industry and LifeTime's misconduct, mainly through its creator David W. Svete, have been previously described in *H. Thomas Moran, II v. A/C Financial, Inc., et al.*, 3:05CV71 (S.D. Ohio) (Doc. #546, 596).  In short, LifeTime, through Svete and others, defrauded individuals who purchased or invested in LifeTime's viatical contracts.  The massive scope of their misconduct is perhaps best understood by Svete's federal criminal convictions related to LifeTime and the $100,722,605.34 restitution order entered in the federal criminal case against Svete.  *See id.*; *see also* Doc. #8 at ¶20.

---

[1]  Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

In 2004, the investors in LifeTime filed a civil case in this Court against LifeTime and Svete. The Court took exclusive jurisdiction and possession of LifeTime's assets, created a Receivership, and appointed H. Thomas Moran, II as Receiver to represent the interests of more than 3,000 individuals, who together had lost millions through investments in viatical contracts with LifeTime. (Doc. #8, Exhibits 1-5). The need to create the LifeTime Receivership was "both necessary and appropriate in order to prevent waste and dissipation of the assets of Defendant [LifeTime] to the detriment of the investors...." (Doc. #8, Exh. 2).

The Court authorized the Receiver "to take any and all action as the Receiver may deem necessary or prudent for the preservation, maintenance, and administration of the LifeTime Portfolio comprised of viatical and life settlement policies and beneficial interests therein...." *Id*., Order at 3. In addition, the Order appointing the Receiver authorized him to file civil actions to protect the assets of the LifeTime receivership. *Id*., Order at 5.

Pursuant to this court-appointed authority, the Receiver filed the present case against U.S. Bank, N.A., a national banking association, who allegedly acted as both escrow agent and trustee pursuant to contracts executed with LifeTime Capital. *See* Doc. #8 at ¶10. The Receiver claims in part that U.S. Bank breached its duties under the terms of certain contracts with LifeTime and committed additional acts amounting to, among other things, negligence, breach of fiduciary duties, and common law fraud. (Doc. #8 at ¶s 62-95). The Receiver alleges that U.S. Bank has harmed the pooled receivership estate and the investors in an amount over $14,853,720.93. *See id*. at ¶67.

This case is presently before the Court upon U.S. Bank's Motion to Dismiss or, in the Alternative, Motion to Compel Arbitration (Doc. #12), the Receiver's Response (Doc. #14), U.S.

Bank's Reply (Doc. #15), the Receiver's Surreply (Doc. #21), and the record as a whole.

## II.     THE RECEIVER'S CLAIMS

### A.     Two Agreements

Central to the Receiver's claims against U.S. Bank are two Agreements referred to as the Investor Escrow Agreement and the Custody Letter. These Agreements arose as follows.

#### 1.
#### Investor Escrow Agreement

When an individual Investor decided to invest in one or more of LifeTime's viatical life contracts, he or she executed an Investor Escrow Agreement (and an Asset Purchase Agreement). Pursuant to the terms of the Investor Escrow Agreement, the Investor would pay LifeTime a certain purchase price or Purchase Deposit (*i.e.*, the amount of the investor's investment). LifeTime would then forward these Agreements plus the Purchase Deposit to the "Custodian," who held it pursuant to the terms of the Investor Escrow Agreement. *See* Doc. #8, Exh. 9, Article II at ¶2.

The Investor Escrow Agreement identifies Firstar Bank, N.A. as the Custodian. (Doc. #8, Exh. 9 at p.1). Firstar Bank eventually became U.S. Bank, N.A.[2]

The Investor Escrow Agreement describes the "Custodian's Duties and Rights As Escrow Agent" in part as follows:

> Custodian will maintain three (3) accounts for the purpose of transacting the Escrow Agreement: (1) A Premium Deposit Account that shall serve as a single trust account to account for all Purchase Deposits with each Purchaser's funds identified as a Purchase Asset; (2) a Premium Reserve Account for the

---

[2] The Receiver's First Amended Complaint states that U.S. Bank, N.A. is the successor in interest to Star Bank, N.A., which at some point was renamed, "Firstar Bank, N.A." (Doc. #8 at 3 n.1). U.S. Bank, N.A. came into being due to a merger of U.S. Bank, N.A. of Minneapolis and Firstar Bank, N.A. of Cincinnati. *Id.*

3

>    purpose of paying policy premiums when due, and (3) a Premium Benefit
>    Account for the purpose of accepting the payment of Policy Benefits or trust
>    proceeds at Policy Maturity.  All accounts will be trust accounts and subject to the
>    fiduciary duties normally related thereto.

(Doc. #8, Exh. 9, Article VI, ¶2).

The Investor Escrow Agreement also contains a mandatory arbitration provision stating:

>    All disputes and controversies of every kind and nature between the
>    parties to this Agreement arising out of or in connection with this Agreement or
>    the Escrow Agreement including, but not limited to, its existence, construction,
>    validity, interpretation or meaning, performance, non-performance, enforcement,
>    operation, breach, continuance, or termination thereof shall be submitted and
>    settled by arbitration in accordance with the rules of the American Arbitration
>    Association.  The arbitration shall be held in Dayton, Ohio before a single
>    arbitrator.  The arbitrator's decision and award shall be final and binding and may
>    be entered in any court having jurisdiction thereof.  The arbitrator shall not have
>    the power to award punitive, exemplary, consequential damages or attorney
>    fees....

(Doc. #8, Exh. 9, Article VII, ¶2).

## 2.
## The Custody Letter

LifeTime and Star Bank, N.A. (later, Firstar Bank, N.A.) further documented their contractual relationship in a "Custody Letter of Instructions Without Investment Review for LifeTime Capital, Inc. Escrow Agreement for Viatical Settlements" – or more succinctly – "the Custody Letter."  (Doc. #9, Exh. 10).

The Custody Letter instructs Star Bank to "hold the property listed on the attached schedule for us [LifeTime] as our agent, together with any property that may be delivered to you from time to time to be evidenced by further receipts or statement accountings...."  (Doc. #8, Exh. 10 at p.1).  The Custody Letter further instructs, in part, "We direct you to keep records of our property and give the same care to the custody of our property that you give to other, similar

accounts.... " *Id*. The Custody Letter directs Star Bank, "in conjunction with the Escrow Agreement...," *id*. at p.1, to perform numerous duties, for example, collecting all income in a timely manner and remitting income to LifeTime as instructed verbally or in writing. *Id*. at p. 1.

The Custody Letter also addresses Star Bank's compensation and permits either LifeTime or Star Bank to "terminate this arrangement at any time upon written notice, in conjunction with the escrow agreement...." *Id*. at p.2.

Perhaps most significantly for the purposes of this case is the following reference in the Custody Letter to the Investor Escrow Agreement:

> We hereby ratify the Attached LifeTime Capital, Inc. Escrow Agreement for Viatical Settlement as the guiding instrument of services being provided by Star.

(Doc. #8, Exh. 10).

The Custody Letter on its face does not contain a mandatory arbitration provision.

### B.  First Amended Complaint

The Receiver's First Amended Complaint describes the services Star Bank (hence, U.S. Bank) provided as "Custodian" under the terms of the Investor Escrow Agreement and the Custody Letter as follows.

When an Investor executed the required Agreements and sent them to LifeTime along with the Purchase Deposit, LifeTime forwarded the funds to the Custodian, who deposited the funds into Purchase Deposit Account #3808-5300 ("PDA 3808-5300"). LifeTime then purchased a life insurance policy from an individual diagnosed with a terminal illness, known as

5

a viator.[3]

Next, LifeTime would require the Custodian to transfer money from PDA 3808-5300 to a sub-account identified by the viator's name in Escrow Account #3808-5302 ("EA 3808-5302"). Money from EA 3808-5302 was used to pay the viator, the broker, and to pay LifeTime's costs and fees. (Doc. #8 at ¶44).

Money was also transferred from the sub-accounts in EA 3808-5302 to corresponding sub-accounts identified by viator initials in a Premium Reserve Account #3909-1050 ("PRA 3903-1050") "held by Defendant as contemplated by the Investor Escrow Agreement. The PRA sub-accounts were supposed to be funded with an amount of money sufficient to pay premiums for the anticipated life expectancy of the viator plus one year." (Doc. #8, ¶45).

The Receiver claims that U.S. Bank, as Custodian, breached its duties set by the Custody Letter and the Investor Escrow Agreement: (1) when it disbursed funds from PDA 3808-5300 to LifeTime's operating account for payment of third parties not authorized by LifeTime Escrow Agreement[4]; (2) when it disbursed funds from PDA 3808-5300 directly to third parties not authorized by the LifeTime Escrow Agreement; (3) when it disbursed funds from PRA 3909-1050 to a third party not authorized by the LifeTime Escrow Agreement; and (4) when it transferred funds between PRA 3909-1050 sub-accounts. (Doc. #8, ¶s 63-67).

The Receiver also claims that U.S. Bank acted negligently when it, among other things, failed to exercise reasonable care by disbursing and transferring escrowed funds in direct

---

[3] For further information on this viatical or life settlement contract, see *H. Thomas Moran, II v. A/C Financial, Inc., et al.*, 3:05CV71 (S.D. Ohio) (Doc. #546, 596).

[4] The First Amended Complaint refers to the Custody Letter as the "LifeTime Escrow Agreement." (Doc. #8, ¶41).

contravention of the authorizations contained in the LifeTime Escrow Agreement.  *Id*. at ¶70.

The Receiver claims that U.S. Bank breached its fiduciary duties by knowingly and intentionally disbursing and transferring escrowed funds in direct contravention of the authorizations contained in the LifeTime Escrow Agreement.  *Id*. at ¶74.

As to common law fraud, the Receiver alleges in part that U.S. Bank expressly approved and authorized material misrepresentations made in LifeTime's promotional and marketing materials.  These misrepresentations assured investors that an independent escrow agent would insure that investment funds were deposited in PDA 3808-5300 from which money would be transferred to purchase viaticals and from which money would be transferred to pay premiums on the viaticals.  The Receiver further alleges in part that U.S. Bank made material misrepresentations that it would hold and disburse escrowed funds consistent with the requirements of the LifeTime Escrow Agreement.

## III.   MANDATORY ARBITRATION

### A.   The Parties' Contentions

U.S. Bank seeks an Order compelling arbitration of the Receiver's claims pursuant to a mandatory arbitration provision in the Investor Escrow Agreement.  U.S. Bank seeks to invoke this mandatory arbitration provision because LifeTime agreed to it in the Investor Escrow Agreement and in light of the Receiver's allegation in the First Amended Complaint that the Investor Escrow Agreement was "the guiding instrument for the services that the Defendant would provide."  (Doc. #8, ¶42).

U.S. Bank argues, "In *Javitch v. First Union Sec., Inc*., the Sixth Circuit held that a receiver for a company involved in a fraudulent investment scheme was 'bound to the arbitration

agreements to the same extent that the receivership entities would have been absent the appointment of the receiver.' 315 F3d 619, 627 (6th Cir. 2003)." (Doc. #12 at 11).

The Receiver contends that compelling arbitration is unwarranted because the arbitration provision in the Investor Escrow Agreement was not incorporated into the Custody Letter. The Receiver explains that the Custody Letter "refers to the Investor Escrow Agreement in setting the parameters of U.S. Bank's duties and obligations to LifeTime." (Doc. #14 at 26). The Receiver argues that this incorporation by reference is limited to any particular and specified purpose for the incorporation by reference. The Receiver therefore reasons, "The plain language of the [Custody Letter] states that the only provisions of the Investor Escrow Agreement incorporated by reference are those dealing with the **services** U.S. Bank would provide as a result of LifeTime's sale of viaticals.... Arbitration was not a service provided by Star (U.S. Bank) to LifeTime as a result of the LifeTime Escrow Agreement." (Doc. #14 at 27)(Receiver's emphasis).

### B. The Federal Arbitration Act

Under the Federal Arbitration Act (FAA), "[a] written agreement to arbitrate disputes arising out of a transaction in interstate commerce 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Javitch*, 315 F.3d at 624 (quoting in part 9 U.S.C. §2).

"Manifesting a 'liberal federal policy favoring arbitration agreements,' the FAA 'is at bottom a policy guaranteeing the enforcement of private contractual arrangements.'" *Javitch*, 315 F.3d at 624 (quoting in part *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985)); *see Cooper v. MRM Investment Co.*, 367 F.3d 493, 498 (6th Cir. 2004).

"If the parties contract to resolve their disputes in arbitration rather than in the courts, a party may not renege on that contract absent the most extreme circumstances." *Stout v. J.D. Byrider*, 228 F.3d 709, 715 (6th Cir. 2000).

"Courts are to examine the language of the contract in light of the strong federal policy in favor of arbitration.... Likewise, any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (citations omitted).

"However, the federal policy in favor of arbitration is not an absolute one. Arbitration under the Federal Arbitration Act is 'a matter of consent, not coercion.'" *Albert M. Higley Company v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006) (quoting in part *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).

### C. <u>Agreement to Arbitrate?</u>

The Court's first task when considering a motion to compel arbitration under the FAA is to determine whether the parties agreed to mandatory arbitration. *Stout*, 228 F.3d at 714. Thus, in the present case, the initial inquiry is whether LifeTime and U.S. Bank (through Star Bank or Firstar Bank) agreed to mandatory arbitration. *See id*. Resolving this inquiry begins with the recognition that the Receiver, as U.S. Bank correctly asserts, "is bound to the arbitration agreements to the same extent that the receivership entities [here, LifeTime] would have been absent the appointment of the receiver." *Javitch*, 315 F.3d at 627.

The Investor Escrow Agreement contains a mandatory arbitration provision. *Supra*, §II(A). The signatories and parties to the Investor Escrow Agreements were LifeTime and

9

particular investors.[5]  *See* Doc. #8, Exh. 9.  Consequently, at first glance, LifeTime's agreement to the arbitration provision in the Investor Escrow Agreement appears to require the Receiver to proceed to arbitration.  A problem arises, however, because neither U.S. Bank nor its predecessor Star Bank, (renamed, Firstar Bank) was a signatory to the Investor Escrow Agreement.  Considering the Investor Escrow Agreement alone, then, this Agreement on its face may only bind LifeTime and the investors to mandatory arbitration.  Yet this is not the whole picture.

The Investor Escrow Agreement identifies Firstar Bank, N.A. as the Custodian, and it sets forth numerous duties Firstar Bank must perform as Custodian.  *See* Doc. #8, Exh. 9 at pp. 1-2, 5, and Article VI.  Additionally, the first written paragraph of the Investor Escrow Agreement identifies Firstar Bank as one of the "the Parties" to the Agreement.  (Doc. #8, Exh. 9 at p. 1).

Any doubt about Firstar Bank's status as a party to the Investor Escrow Agreement is created only by the omission of its signature on the Agreement.  This doubt, however, is removed by the Custody Letter, which unambiguously confirmed Firstar Bank's duties and rights as set forth in both the Custody Letter and Investor Escrow Agreement.  Read together and as a whole giving effect to all the terms of each, both the Custody Letter and the Investor Escrow Agreement establish Firstar Bank's status as a party to the Investor Escrow Agreement.  *See Mead Corp. v. ABB Power Generation, Inc*., 319 F.3d 790, 797 (6th Cir. 2003) ("It is well settled that contracts must be read as a whole, and they must be interpreted in such a manner as to give

---

[5]  The Court assumes, as do the parties, that Firstar Bank or U.S. Bank was not a signatory to any of the many Investor Escrow Agreements signed by LifeTime and the investors.  *See* Doc. #8, Exh. 9.

effect to every provision."). This conclusion, in turn, demonstrates that LifeTime reached a mandatory arbitration agreement with Firstar Bank because the mandatory arbitration provision unambiguously requires, "All disputes and controversies of every kind and nature between **the parties** to this Agreement ... shall be submitted and settled by arbitration...." (Doc. #8, Exh. 9, Article VII at ¶2) (emphasis added).

This is not sufficient for the Receiver, who argues that the plain language of the Custody Letter did not incorporate all of the terms of the Investor Escrow Agreement; "[r]ather, the Custody Letter plainly demonstrates that the parties *only* intended to incorporate the [Investor] Escrow Agreement with respect to the 'services being provided by [Defendant]....'" (Doc. #21 at 8)(citation omitted). On this point (again) the Custody Letter provided:

> We hereby ratify the Attached LifeTime Capital, Inc. Escrow Agreement for Viatical Settlement as the guiding instrument of **services** being provided by Star.

*Supra*, §II(A)(2); *see* Doc. #8, Exh. 10, ¶(o) (emphasis added).

The plain and unambiguous meaning of this language in the Custody Agreement accomplishes what it says; it establishes the Investor Escrow Agreement "as the guiding instrument of the services" Star Bank would provide. This language does not additionally accomplish what the Receiver hopes – to eliminate LifeTime's mandatory duty to arbitrate set by the Investor Escrow Agreement, because nothing in this language specifically limits the application of that provision. Examination of the remaining language of the Custody Letter does not reveal any limitation on the Investor Escrow Agreement's mandatory arbitration provision. Such language is necessary because the first full paragraph of the Investor Escrow Agreement specifically included Firstar Bank within "the parties" to the Agreement. *See* Doc. #8 at p.1.

11

The Investor Escrow Agreement then broadly included "the parties" – hence LifeTime and Firstar Bank – in the language of the mandatory arbitration provision. *See* Doc. #8, Article VII, ¶2. In light of this, to read the Custody Letter as the Receiver does requires ignoring or overlooking this language in the Investor Escrow Agreement without a specific revocation of it in the language of the Custody Letter. Such an approach would be contrary to the principle of Ohio contract law requiring contracts to be read as whole, giving effect to every provision. *See Mead Corp.*, 319 F.3d at 797.

The cases cited by the Receiver do not convince otherwise. The Receiver's cases, generally speaking, recognize that an incorporation by reference can be limited by specific incorporation language. *See, e.g, Scaffidi v. United Nissan*, 425 F.Supp.2d 1159, 1167 (D. Nev. 2005) ("where the reference to another document is made for a particular and specific purpose such a writing becomes a part for such specified purpose only."); *Krause v. Oscar Daniels Co.*, 61 Ohio App. 337 (1939).[6] This does not assist the Receiver in avoiding arbitration, because the specific terms of the Investor Escrow Agreement identified Firstar Bank and LifeTime as "the parties" who were included in its mandatory arbitration provision. The language of the Investor Escrow Agreement accomplishing this was not limited by either "the guiding instrument of services..." language or any other provision of the Custody Letter. Consequently, when read as a whole, no doubt remains that LifeTime's agreement with Firstar Bank (now U.S. Bank) to the mandatory arbitration provision was not limited or rescinded by the Custody Letter. *See Mead Corp.*, 319 F.3d at 797; *cf. Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 263 (6th Cir. 1988)("It

---

[6] "Where the plans and specifications are referred to in a contract for a particular purpose, they become part of the contract solely for the purpose mentioned." *Krause*, 61 Ohio App. at 337, syll., ¶1.

12

has been held that the meaning to be given the words of a contract must be the one that carries out the intent of the parties as determined by the circumstances under which the contract was made.").

### 2.
### Remaining Issues

A review of the Receiver's claims in the First Amended Complaint reveals that they are within the scope of the mandatory arbitration provision. Given the broad language of the arbitration provision, the Receiver, to his credit, does not assert otherwise. *See* Doc. #14 at pp. 25-28; *see also* Doc. #21 at pp. 5-8. The language of mandatory arbitration provision requires arbitration of "[a]ll disputes and controversies of every kind and nature ... arising out of or in connection with this Agreement or the Escrow Agreement including, but not limited to, its existence, construction, validity, interpretation or meaning, performance, non-performance, enforcement, operation, breach, continuance, or termination ...." (Doc. #8, Exh. 9, Article VII, ¶2). The Receiver's claims in this case arise out of or are connected to the terms of the Investor Escrow Agreement and Custody Letter. Consequently, these claims are subject to the parties' agreement to mandatory arbitration. *See Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 577 (6th Cir. 2003)("where the arbitration clause is broad, only an express provision excluding a specific dispute, or 'the most forceful evidence of a purpose to exclude the claim from arbitration,' will remove the dispute from consideration by the arbitrators.").

U.S. Bank also raises two alternative grounds for seeking dismissal: the Receiver lacks standing to raise claims on behalf of the investors and the equitable doctrine of *in pari delicto* precludes the Receiver raising his present claims. These, however, present issues that must be

resolved by the arbitrator rather than this Court. "[T]he Supreme Court has held that once a court determines that the agreement to arbitrate has not been fraudulently induced, all other issues falling within that agreement are to be sent to arbitration." *Ferro Corp. v. Garrison Industries, Inc.*, 142 F.3d 926, 933 (6th Cir. 1998)(discussing *Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 403-04 (1967)).

Lastly, U.S. Bank seeks an Order staying this case pending the conclusion of arbitration. "FAA §3 provides that when the Court finds the issues arbitrable, 'the court in which such suit is pending ... shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.'" *Orcutt v. Kettering Radiologists, Inc.*, 199 F.Supp.2d 746, 756 (S.D. Ohio 2002). "The Supreme Court has stated that when the dispute is subject to arbitration, the FAA 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Orcutt*, 199 F.Supp.2d at 756-57 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)). "The Sixth Circuit has permitted courts to dismiss cases, subject to reinstatement, where there 'is nothing left for the district court to do but execute judgment.'" *Orcutt,*199 F.Supp.2d at 756-57 (citing *Arnold v. Arnold Corp.-Printed Communications for Business,* 920 F.2d 1269, 1276 (6th Cir.1990))(other citation omitted). Since the Receiver's claims fall within the scope of the parties' broad mandatory arbitration agreement, arbitration will resolve all of the Receiver's claims, and nothing will be left for this Court to do except execute a Judgment. As a result, dismissal of the instant case without prejudice, rather than a stay, is warranted. *See Orcutt*, 199 F.Supp.2d at 756-57.

14

**IT IS THEREFORE RECOMMENDED THAT:**

1. U.S. Bank's Motion to Compel Arbitration (Doc. #12) be GRANTED, the Receiver's claims be DISMISSED without prejudice, and the parties be DIRECTED to proceed to arbitration pursuant to the FAA and the terms of their mandatory arbitration agreement;

2. U.S. Bank's Motion to Dismiss (Doc. #12) be otherwise DENIED without prejudice;

3. The case be terminated on the docket of this Court.


January 4, 2007

                                                s/ Sharon L. Ovington
                                                    Sharon L. Ovington
                                            United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).